The defendant's wife left him and filed this bill to eject him from his home, title to which was in her. He counter-claimed to have his name inserted in her deed, to create an estate by the entirety, claiming that it was omitted from the deed by mistake or fraudulently by her. She died and the suit was revived by her devisees, her two sisters and a brother.
They were married in 1916 and separated in 1932. The property was purchased in 1917 for $2,250 subject to an assessment. There was a down payment of $50, and she negotiated a $2,000 building and loan mortgage, receiving $1,181. The defendant claims he paid the down-money and also $74.70, admitting that his wife paid the balance, $371.60, of the total outlay of $2,377.30.
The property was a ramshackle, and in restoring and adding improvements some thousands of dollars were spent, and he claims it was his money. Most of it was, but she contributed *Page 342 
some; she was earning. The building and loan mortgage was paid off out of his earnings, he claims. Before 1923 he gave her his earnings, he says, and she paid the monthly installments. Thereafter he banked his earnings and gave her $18 a week for the table, except every fourth week when, in lieu, she got $20 to pay the installments. If that was the way before, and three weeks' allowances were stretched to provide a month's food, she, in the household sense at least, paid off the mortgage.
Title being in the wife, it is presumed that the contributions by the defendant toward the purchase price, and the outlays in permanent improvements were gifts-settlement. Whitley v. Ogle,47 N.J. Eq. 67. In rebuttal of the presumption the defendant denies he made gifts and contends that he advanced the money upon his wife's promise to place the title in both names and upon the faith that she had done so.
His testimony is that after the purchase, in a discussion at his mother's home as to how the title should be taken, he suggested that it be placed in both names so that if anything happened either would get it, and that his wife agreed, after submitting it to his mother, who approved; that she frequently spoke of the property as being in both their names, and, critical of his mother, who was about to buy a house in her own name, remarked that their home was in both names and if anything happened to one it would go to the other.
A brother of the defendant corroborates him as to the occurrence at their mother's home, that she agreed to take the title in both names. Some four or five years later, when the brother was about to buy a home, he consulted her and she advised him to take it in both his wife's and his names; that that was the way they bought theirs. On a visit, just before the separation, he noticed there was trouble, and to his inquiry she said that they had had an argument and that she had told the defendant the property was in her name, and being reminded that she had told the witness that it was in both names, she gave the explanation that she was older than her husband and took the title in her name to have a hold on him. *Page 343 
To a woman neighbor, in porch gossip, she said the property was in both their names.
The plumber called in 1921 to collect a bill of $50; the defendant offered $20, and in urging his wife to pay the balance, said to her, "why object to it? The property is as much yours as it is mine," to which she made no reply.
To a contractor who had given an estimate for some alterations and wanted to know of them who would be responsible, she replied that the place was in both their names. That was in 1929.
After the wife quit she consulted counsel about the property and gave him instructions to make a settlement, conceding that the defendant had an interest in the property, at least for the building and loan installment payments.
The defendant avers that he did not learn of the deception until just before the separation when, upon insisting that her sister stay away from the house, his wife resisted and asserted her right of absolute ownership; that a quarrel ensued and that his wife quit three weeks later.
In discredit, the brother of the wife, one of the devisees, testified that in October, 1931, five months before the time fixed by the defendant as the first he learned he had been deceived, the defendant remarked to him, while on the way to visit the wife, who was ill at Lakewood, "I don't care who she leaves this house to, but if she leaves it to the Essigs I will fight them to the last ditch." Mrs. Essig is one of the devisees. This statement is unexplained and undenied. Coming at the end of the hearing, the significance now claimed for it evidently was not sensed by the trial counsel. At best, it is but an excerpt of a conversation; with the context, it likely would assume a different complexion, not inconsistent with the established facts.
The counter-claim states that the defendant learned that the title was in his wife's name shortly after the purchase. Counsel at the hearing said it was their mistake and took responsibility for it as well as for another misstatement in the counter-claim that the down payment was $250 instead of $50. The faulty allegation was unknown to the defendant, *Page 344 
and the solicitor who drew the pleadings said he got his information second hand. It was counsel's mistake.
Ordinarily it would be hard to believe that during the fifteen years of married life the defendant did not learn that the home was in his wife's name, but here it is conceivable and in these peculiar circumstances probable. When they were married she was thirty-two and mature; he, twenty-one, in his adolescence. She was a secretary with business experience; he, a mechanic, with none. To this callow, perhaps love-blind youth, she was his "missus," as he called her. He was her come-along-little-boy. For the first seven years he handed over his pay envelope; she even bought his clothes. When he fell upon the house and saw its prospects, "their nest," she let him believe they were buying it, but took care to draw the receipt for the $50 down payment in her name, concealing it from him. After she arranged for the building and loan mortgage, he signed it on the dotted line. She attended to the closing and saw to it that the deed was in her name. All was left to her; confident, he yielded to her years and business superiority without thought of duplicity. He never saw the deed; she kept it in her safe deposit box. He saw the water bills, and perhaps the tax bills, all in her name, but, as he says, they did not mean to him that his name was not in the deed, as she had promised it would be, and as she had repeatedly represented, and he let it go at that. As for prying: It would have offended, evinced distrust, and discovery of the truth would have led to disruption, as it finally did. Whenever he broached the subject of title, it was dropped as quickly for harmony's sake; experience had taught him the folly of it, for she had a habit of leaving him when discord came.
It is our conviction that the wife fraudulently took the title in her own name and that the defendant invested his savings in the belief, fraudulently induced, that the property was theirs by the entirety.
Counsel for complainants calls to his aid the rule that the husband's proof must be, in the language of our court of errors and appeals, in McGee v. McGee, 81 N.J. Eq. 190, *Page 345 
"certain, definite, reliable, and convincing, leaving no reasonable doubt of the intention of the parties" to overcome the presumption of a settlement and to establish a resulting trust. The reason for the requirement of this quality of proof is that the husband procured the title to be taken in his wife's name; he created the legal estate which he seeks to destroy. In the instant case the defendant's cause of action is the fraudulent procurement of the deed, and by one who stood in confidential relationship. Upon establishing the fraud by satisfactory proof equity will protect his savings from going to strangers.
The defendant is entitled to a reformation of the deed or to have it decreed that the complainants hold the property in trust for him.